O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FREDERICK C.,

Plaintiff,

v.

ANDREW M. SAUL, Commissioner of Social Security,

Defendant.

Case No. 8:20-cv-00018-KES

MEMORANDUM OPINION AND ORDER

**I.**

**PROCEDURAL BACKGROUND**

In February 2017, Plaintiff Frederick C. ("Plaintiff") applied for social security disability insurance benefits ("DIB") alleging an onset date of March 15, 2009, with a last date insured ("LDI") of December 31, 2014. Administrative Record ("AR") 15, 17, 120-21. On January 16, 2019, the Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, testified along with a vocational expert ("VE"). AR 24-46. On February 15, 2019, the ALJ issued an unfavorable decision. AR 15-20.

At step two of the sequential evaluation process, the ALJ found that Plaintiff suffered from one medically determinable impairment ("MDI"): "right shoulder

tendon injury with atrophy." AR 17. The ALJ found that this MDI was not "severe" prior to Plaintiff's LDI, because there was insufficient evidence to establish that it significantly limited Plaintiff's ability to perform basic work-related activities for twelve consecutive months prior to his LDI. Id.

To reach this finding, the ALJ considered "the objective medical evidence and other evidence," including Plaintiff's symptom testimony. AR 18. The ALJ noted that Plaintiff produced little medical evidence (fewer than 50 pages at Dkt. 15-8) and only one treating record reflecting a complaint of shoulder pain prior to his LDI. AR 18-19, citing AR 196. Even after considering Plaintiff's testimony and his later treating records, the ALJ concluded that Plaintiff had not met his burden of providing evidence sufficient to establish the existence of a severe MDI between his alleged onset date and LDI. AR 19. The ALJ therefore concluded that Plaintiff was not disabled. AR 20.

## II.

## ISSUES PRESENTED

Issue One: Whether the ALJ erred by failing to obtain testimony from a medical expert ("ME").

Issue Two: Whether the ALJ erred in evaluating Plaintiff's symptom testimony.

Issue Three: Whether the ALJ erred in evaluating the opinion of surgeon Dr. Youderian.

(Dkt. 16, Joint Stipulation ["JS"] at 2.)

## III.

## SUMMARY OF THE EVIDENCE

Plaintiff worked for about 30 years as a produce clerk at a grocery store doing heavy or very heavy work. AR 29, 41. He had two surgeries on his right shoulder in 1964 and 2002. AR 31. Sometime after his 2002 surgery, he suffered an injury at work trying to catch something heavy falling from a high shelf, and his

doctor told him that little could be done to treat his ongoing shoulder pain. AR 31-32. He kept working fulltime until March 2009 to retain his pension benefits, but he effectively reduced his hours by trading shifts with other employees. AR 30-32.

In July 2009 during an appointment to treat suspected skin cancer, Plaintiff told his doctor, "right should pain and restriction in movement. Had surgery 15 years ago. Feels it will dislocate if he lifted his shoulder past 90 degrees." AR 196. At the time, Plaintiff was not taking any prescription medication. Id.

The AR contains no subsequent record of shoulder pain or related treatment for more than seven years. On February 16, 2017, Plaintiff consulted with Dr. Kadakia at South County Orthopedic Specialists to evaluate his right shoulder pain. AR 206. Plaintiff told Dr. Kadakia that his "shoulder keeps popping out" and the "problem began several years ago" with no recent change in the severity of his symptoms. Id. Plaintiff did not have any prior imaging or diagnostic studies, and he was not taking any prescription medication. Id. After a physical examination and x-rays, Dr. Kadakia diagnosed Plaintiff with "primary osteoarthritis, right shoulder" and ordered an MRI. AR 208. Dr. Kadakia described Plaintiff's condition as "right shoulder severe end-stage OA glenohumeral joint" and referred him to a surgeon, Dr. Youderian, to discuss a potential shoulder joint replacement. AR 209.

The very next day, on February 17, 2017, Plaintiff applied for DIB based on "right shoulder tendon injury with atrophy." AR 148. The February 24, 2017 MRI revealed "severe glenohumeral joint degenerative change" with a "bone-on-bone appearance," labral tearing, tendinopathy, and other abnormalities. AR 212-13.

In March 2017, Dr. Youderian completed a medical assessment form. AR 215-17. Dr. Youderian opined that Plaintiff had "no lower extremity dysfunction outside of obesity" and no difficulties sitting, standing, or walking for 6-8 hours per day. AR 215. He limited Plaintiff's lifting, however, to "1-2 pounds" due to "severe arthritis and partial tendon tearing to right shoulder." Id. He opined that

Plaintiff could not use his ***left*** hand for grasping, manipulating, or reaching, but he could use his ***right*** hand for such activities. Id. Finally, he opined that Plaintiff would miss work "about twice a month" due to "recurrent pain." Id.

In June 2017, Plaintiff advised that his condition had not changed since February 2017. AR 157. State agency consultant Dr. Cooper determined that there was "insufficient evidence" to support Plaintiff's DIB application. AR 55.

In September 2017 after an insurance change, Plaintiff told a new treating physician, Dr. Carlos Sobral, that he had experienced right shoulder pain "for the past 30 years" and a recent MRI had shown bone-on-bone conditions. AR 222. Dr. Sobral observed a "tender anterior right shoulder" with a limited range of motion and diagnosed "derangement of shoulder joint." Id. Plaintiff was not prescribed any pain medication. AR 223.

In September and December 2017, Plaintiff rated his pain at zero. AR 221-22. In January 2018, during an appointment for pneumonia, Plaintiff rated his pain at 1/10. AR 220. He was still not taking any prescription pain medication. AR 220-21.

In September 2018, Dr. Youderian completed an interrogatory with a blank to indicate the date when the work restrictions he assessed in March 2017 first applied. He did not specify a starting date, instead writing, "long before my evaluation on 3/15/17." AR 217. He explained, "This is a chronic condition that has progressively worsened over a period of many years." Id. He also clarified that he "misunderstood the form" and had mistakenly switched the limitations applicable to Plaintiff's right and left upper extremities. Id. The AR contains no treating records from Dr. Youderian.

At the January 2019 hearing, Plaintiff testified that he stopped working in 2009 because pain in his right shoulder was "killing" him. AR 30. Since 2009, he could not raise his right hand high enough to waive or give an oath. AR 36. He estimated that he could lift ten pounds. AR 37. He felt that his condition "may be

getting worse." AR 36. Nevertheless, he reported that over-the-counter "Aleve is pretty good" for pain relief, and he could do normal activities like shopping, driving, and cleaning by using his left arm more than his right. AR 40-41.

## IV.

## DISCUSSION

### A. ISSUE ONE: Plaintiff's Request for an ME.

#### 1. Relevant Administrative Proceedings.

In October 2018, Plaintiff's counsel submitted a letter requesting that an orthopedic ME be available to testify at the hearing. AR 174. Counsel repeated that request in another letter in December 2018, explaining that Plaintiff had "long-standing shoulder issues" and an ME could assist in establishing a disability onset date. AR 179.

No ME attended the hearing. AR 25. Plaintiff's counsel did not ask the ALJ why no ME was present. Plaintiff's counsel argued that Dr. Youderian's opinion, Plaintiff's testimony, and the February 2017 MRI were sufficient evidence to establish that Plaintiff's disabling shoulder pain had existed before Plaintiff's LDI. AR 27-28. Counsel argued that if limited to light work, Plaintiff would be disabled under the medical-vocational grid rules due to his age and lack of transferrable skills. AR 28, 45; Dkt. 18 at 8 (citing Table 2, Rule 202.06).[1]

---

[1] Rule 202.06 applies to persons of advanced age with a high school degree or more, but whose education does not provide direct entry into skilled work, and whose previous work experience included skilled or semi-skilled work, but who lacks transferrable skills. 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.06. Footnote 2 to Rule 202.06 incorporates language from Rule 202.00(c), which provides: "However, for individuals of advanced age who can no longer perform vocationally relevant past work and who have a history of unskilled work experience, or who have only skills that are not readily transferable to a significant range of semi-skilled or skilled work that is within the individual's functional capacity, or who have no work experience, the limitations in vocational adaptability represented by functional restriction to light work warrant a finding of disabled. Ordinarily, even a high school education or more which was completed

The VE testified that if a hypothetical worker could lift only 10 pounds with his right arm but could lift more weigh with his left arm, then it would be "difficult" to classify his functional capacity as "light work," because the exertional restrictions in the Dictionary of Occupational Titles ("DOT") are bilateral. AR 44-45.

In March 2019, Plaintiff submitted a brief in support of his request for Appeals Council review, arguing that the ALJ was required to grant his request for an ME. AR 180-81. The Appeals Council denied review. AR 1.

**2. Legal Standards Governing the Appointment of an ME.**

Plaintiff cites Armstrong v. Commissioner, 160 F.3d 587 (9th Cir. 1998). (JS at 3.) In Armstrong, the Ninth Circuit noted that while claimants have the burden of proving disability prior to their LDI, ALJs have a duty to assist in developing the record. 160 F.3d at 589. To determine the scope of the ALJ's duty, the Ninth Circuit looked to a 1983 Social Security Ruling ("SSR") 83-20, which stated in relevant part:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the [ALJ] ***should*** call on the services of a medical advisor when onset must be inferred.

---

in the remote past will have little positive impact on effecting a vocational adjustment unless relevant work experience reflects use of such education."

Id. at 589-90 (emphasis added). The court found that "in this context 'should' means 'must.'" Id. at 590. The Ninth Circuit concluded that because the onset date was "unclear," the ALJ "committed reversible error by failing to call a [ME] before inferring an onset date." Id. at 589.

Plaintiff, however, cannot rely on Armstrong, because SSR 83-20 was rescinded and replaced by SSR 18-01p in October 2018 before Plaintiff's administrative hearing. See SSR-01p, at § III ("This SSR is applicable on October 2, 2018. … We will apply this SSR to new applications filed on or after the applicable date of the SSR and to claims that are pending on and after the applicable date."); see also Petersen v. Berryhill, 737 F. App'x 329, 332 n.1 (9th Cir. 2018) ("Because the prior [SSR] ruling was in effect at the time of the ALJ's decision, the ALJ was bound to follow it."); Richardson v. Saul, No. 2:18-00468-N, 2020 U.S. Dist. LEXIS 45928, at *18, 2020 WL 1276102, at *7 (S.D. Ala. Mar. 17, 2020) ("Unless their language indicates otherwise, changes to administrative rules generally apply prospectively; therefore, the ALJ was bound to follow SSR 17-2p, the operative ruling in effect ***at the time of her decision***, rather than SSR 96-6p.") (emphasis added); Dkt. 18 at 3 ("The effective date of SSR 18-1p is October 2, 2018, such that this should apply to this case."). Plaintiff also cites Diedrich v. Berryhill, 874 F.3d 634, 639 (9th Cir. 2017), and Bolster v. Astrue, 2012 U.S. Dist. LEXIS 31953 at *8-9, 2012 WL 786825, at *3 (D. Or. March 9, 2012). (JS at 3, 8.) Both of these cases relied on Armstrong and the now-rescinded SSR 83-20.[2]

---

[2] Plaintiff argues that because Defendant's portion of the JS did not argue that Plaintiff relied on the wrong SSR, Defendant waived that argument, and Defendant's waiver precludes the Court from applying the correct SSR. (Dkt. 18 at 1-2.) Nothing that Defendant did, or failed to do, precludes the Court from applying the correct SSR.

After the effective date of SSR 18-1p, ALJs have discretion to appoint an ME to assist them in determining the established onset date ("EOD") of a progressive disease, but they are never required to do so, as follows:

> At the hearing level …, if the ALJ needs to infer the date that the claimant first met the statutory definition of disability, he or she may call on the services of an ME by soliciting testimony or requesting responses to written interrogatories (i.e., written questions to be answered under oath or penalty of perjury). The decision to call on the services of an ME is always at the ALJ's discretion. Neither the claimant nor his or her representative can require an ALJ to call on the services of an ME to assist in inferring the date that the claimant first met the statutory definition of disability.

SSR 18-01p, at § I.B.2.

**3. Analysis of Claimed Errors.**

a. The ALJ's Failure to Appoint an ME.

Plaintiff argues that the ALJ "should have obtained the opinion of an ME addressing if the [lifting and reaching] limitation [assigned by Dr. Youderian in March 2017] was applicable prior to the DLI [of December 2014]." (JS at 3.) Plaintiff suggests that an ME could have reviewed the February 2017 MRI and, based on the severity of the degenerative changes observed, offered opinions about when the degenerative process started and when it progressed to the point of causing disabling symptoms. (JS at 5-6.) Plaintiff argues this error was prejudicial, because if he could lift only 10 pounds with his right arm, then he would be limited to light work and "grid out" as disabled under Rule 202.06. (JS at 3; Dkt. 18 at 8.)

Plaintiff has failed to demonstrate legal error by the ALJ. SSR 18-01p expressly establishes that ALJs are never required to appoint an ME to ascertain the onset date of symptoms.

Plaintiff argues that even applying SSR 18-01p, the ALJ still erred by failing to consider all available evidence available and develop a complete medical history. (Dkt. 18 at 3.) Plaintiff appears to be referring to this language of the SSR:

> We need specific medical evidence to determine whether a claimant meets the statutory definition of disability. In general, an individual has a statutory obligation to provide us with the evidence to prove to us that he or she is disabled. This obligation includes providing us with evidence to prove to us when he or she first met the statutory definition of disability. The Act also precludes us from finding that an individual is disabled unless he or she submits such evidence to us. The Act further provides that we:
>
> [S]hall consider all evidence available in [an] individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability.
>
> […]
>
> "Complete medical history" means the records from the claimant's medical source(s) covering at least the 12-month period preceding the month in which the claimant applied for disability benefits or SSI payments. … If applicable, we will develop the claimant's complete medical history for the 12-month period prior to the month he or she was last insured for disability insurance benefits.

SSR 18-01p, at § I.B.

Here, no treating records exist for 2014, which is the 12-month period before Plaintiff's LDI. And while the ALJ did discuss the serious findings of Plaintiff's February 2017 MRI (AR 19), the ALJ did not commit legal error by concluding that the MRI did not support a finding that Plaintiff suffered from disabling

shoulder pain before his LDI. Progressive diseases do not progress along fixed, predictable schedules. Even Dr. Youderian, who examined Plaintiff and the February 2017 MRI, when asked to state when the work limitations he assessed began, could offer nothing more specific than "long before" March 2017. AR 217. That could mean 2015 or 2016.

Regarding prejudice, Plaintiff wrongly assumes that if Dr. Youderian's opinion was considered as applying pre-LDI, he would have been found capable of no more than light work and thus "disabled" under the grids. Since Plaintiff's impairment affected only his right arm, his exertional abilities would not have perfectly matched "light" work. AR 44. If an individual's RFC falls somewhere in between "light" and "medium" work, then the grids do not apply.[3] If considered under the regulations, then Plaintiff – whose exertional limits affect only his right arm – would be capable of performing jobs that exist in substantial numbers in the national economy. Many judicial decisions reflect VE testimony describing unskilled, light work that can be performed by a one-armed individual. See, e.g., Migliore v. Colvin, No. 1:15-cv-00638-JLT, 2016 U.S. Dist. LEXIS 115063, at *15-17, 2016 WL 8730737, at *6 (E.D. Cal. Aug. 26, 2016) (discussing how the jobs of surveillance monitor, proof runner, and usher "could be done one-handed").

---

[3] See 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(d) ("If an individual's specific profile is not listed within this appendix 2, a conclusion of disabled or not disabled is not directed. Thus, for example, an individual's ability to engage in substantial gainful work where his or her residual functional capacity falls between the ranges of work indicated in the rules (e.g., the individual who can perform more than light but less than medium work), is decided on the basis of the principles and definitions in the regulations, giving consideration to the rules for specific case situations in this appendix 2."). Plaintiff agrees that the grids would not apply if he "is found limited to somewhere between light and medium from an exertional standpoint." (Dkt. 18 at 10.)

b. The ALJ's Failure to Explain Her Decision.

Alternatively, Plaintiff argues, "At the very least, the ALJ should have considered and addressed the request made by counsel for an ME" to permit review of whether the ALJ properly exercised her discretion. (JS at 4, 7; Dkt. 18 at 5.) Plaintiff fails to cite any legal authority for the premise that ALJs must include in their written opinions an explanation of their reasons for not appointing an ME or even an acknowledgment that an ME was requested. Plaintiff fails to demonstrate legal error.

**B. <u>ISSUE TWO: Plaintiff's Symptom Testimony.</u>**

The ALJ found that Plaintiff's treating records did not support his testimony that he suffered "excruciating pain in his right arm" that limited his lifting ability from 2009 through December 2014. AR 18-19. The ALJ noted that while Plaintiff reported shoulder pain to his doctor in July 2009, and the doctor observed restricted movement, the doctor provided neither follow-up treatment nor prescription pain medication. AR 18-19, citing AR 196. There are no records of any medical attention for Plaintiff's right shoulder after July 2009 until 2017. Plaintiff testified that he took Aleve for pain and occasionally soaked in a hot tub. AR 40.

Conservative treatment can plausibly suggest "a lower level of both pain and functional limitation." <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1434 (9th Cir. 1995); <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2001) (explaining that treatment notes reflecting a conservative course of treatment are "not the sort of description and recommendations one would expect" to accompany a finding of total disability). Here, Plaintiff had no documented treatment for right should injury during his six-year claimed period of disability other than one complaint to a doctor that resulted in no treatment.

Plaintiff explains this by saying that his doctor told him that nothing could be done. AR 31-33. He also says, however, that in 2017, his shoulder pain

became so bad that he threatened to "fire" his doctor if he did not suggest a treatment plan, at which point Plaintiff's doctor referred him for an MRI and a surgical consultation. AR 34. The ALJ could fairly conclude that it Plaintiff's pain had been as serious pre-LDI as it was in 2017, then he would have sought treatment more forcefully earlier. The ALJ did not err in citing Plaintiff's conservative treatment history as a clear and convincing reason to discount Plaintiff's symptom testimony.

**C. <u>ISSUE THREE: Dr. Youderian.</u>**

In September 2018, Dr. Youderian opined that Plaintiff's right shoulder injury significantly limited his right-arm lifting ability. AR 215. He opined that this limitations existed "long before" March 2017, because osteoarthritis is a condition that progressively worsens over "many years." AR 217.

The ALJ gave Dr. Youderian's opinions little weight because "they [were] generated after the date last insured" and "his explanation of 'long before' is vague and does not provide convincing evidence that the claimant's impairment was severe as of the date last insured." AR 19.

Plaintiff argues that the ALJ erred because (1) Dr. Youderian's opinions were not vague, (2) "The fact the opinion was issued after the DLI is not sufficient to reject it;" and (3) the ALJ failed to consider the factors for evaluating opinions from treating physicians. (JS at 30-31.)

Regarding vagueness, Plaintiff argues that Dr. Youderian's statement that Plaintiff's shoulder condition "progressively worsened over a period of many years" logically refers to more than three years, so Dr. Youderian necessarily meant that the functional limitations he assessed in 2017 existed in 2014 and earlier. (JS at 29, 31.) This is not a reasonable interpretation of the evidence. Plaintiff acknowledged shoulder problems going back to the 1960s, yet he spent 30 years working a heavy job. Dr. Youderian's opinion allows equally for Plaintiff

having had osteoarthritis in his right shoulder that progressively worsened over many years without causing severe functional limitations until 2015 or 2016.

Regarding timeliness, Dr. Youderian's opinion was generated *years* after Plaintiff's LDI and noted that Plaintiff suffered from a progressive disease. When expressly asked, Dr. Youderian was unable to pinpoint when Plaintiff's osteoarthritis started to cause functional limitations. The ALJ was not obligated to consider evidence from so long after Plaintiff's LDI, let alone discuss each factor for evaluating opinions from treating physicians. See Magallanes v. Bowen, 881 F.2d 747, 754 (9th Cir. 1989) (noting that a treating physician offering a retrospective opinion, with no personal knowledge of the claimant's historical condition, was little different from any non-treating physician with regard to that time period and was not entitled to deference merely because of his status as a treating physician).

Regarding prejudice, there is no reason to think that the ALJ would have given substantial weight to Dr. Youderian's opinion even if it addressed the relevant time. There are no records showing an ongoing treating relationship, and Dr. Youderian's opinions are inconsistent with other evidence. For example, he opined that Plaintiff would miss work twice a month due to pain, but during Plaintiff's entire insured period, Plaintiff's only pain treatment was over-the-counter Aleve and using a hot tub. AR 40. Plaintiff never testified that he was unable to leave his house to accomplish activities of daily living due to pain. AR 40-41. Even after the February 2017 MRI, Plaintiff rated his pain as non-existent or very low on three occasions. AR 220-22.

**V.**

**CONCLUSION**

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.

DATED: October 16, 2020

Karen E. Scott

KAREN E. SCOTT
United States Magistrate Judge